**Lakeshia DYSON, personally and as Personal Representative for the Estate of Rico Monroe, Jr., Plaintiff,**

v.

**Joseph K. WINFIELD, M.D., Defendant.**

**Lakeshia Dyson, personally and as Personal Representative for the Estate of Rico Monroe, Jr., Plaintiff,**

v.

**Pharmacia & Upjohn, Inc., Defendant.**

Nos. C.A. 97–1665(RCL), C.A. 97–1666(RL).

United States District Court, District of Columbia.

Sept. 21, 2000.

Robert A.W. Boraks, John Hugo Jamnback, Garvey, Schubert & Barer, Washington, DC, for plaintiff.

Vincent Hamilton Cohen, Stephen George Vaskov, Hogan & Hartson, L.L.P.,

Washington, DC, for Pharmacia & Upjohn, defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

On July 23, 1997, Lakeshia Dyson, the plaintiff, filed a complaint against Pharmacia & Upjohn ("P & U"), the defendant, alleging products liability, breach of warranty, and fraud. Now before the Court are several motions by the defendant, as well as one by the plaintiff. The defendant moves for summary judgment on each of the plaintiff's three allegations. The plaintiff moves, pursuant to Rule 56(f), to continue discovery of information relevant to her fraud claim. For the following reasons, this Court GRANTS each of the defendant's motions.

## BACKGROUND

This case arises from Lakeshia Dyson's use of Provera in September and October of 1992. Concerned that she was pregnant, Ms. Dyson went to see Dr. Joseph Winfield, her OB/GYN, on September 26, 1992. She explained to Dr. Winfield that she had had unprotected sex a week prior and that her period was now late. Dr. Winfield gave her a urine pregnancy test which he interpreted as negative. Dr. Winfield then prescribed Provera to Ms. Dyson with the goal of inducing her menstruation.

Ms. Dyson took the Provera and, not having her period, returned to Dr. Winfield's office on October 17, 1992. During the consultation, Dr. Winfield took a blood sample to make certain whether or not she was pregnant. Although Dr. Winfield denies it, Ms. Dyson and her mother, who accompanied her on this visit, assert that they were told by the doctor that Ms. Dyson was pregnant. In any event, as the blood test later revealed, Ms. Dyson was indeed pregnant. At no point during this consultation did Dr. Winfield warn the patient of the risks associated with taking Provera in the early stages of pregnancy.

After her consultation, Ms. Dyson never talked with Dr. Winfield again, choosing instead to continue her prenatal care with a different doctor. In February of 1993, when she was over five months pregnant, Ms. Dyson received a sonogram that revealed the possibility of a birth defect. After considering abortion as an option, she decided to carry her pregnancy to full term because she felt that the child was "a baby" and not "a fetus." Dyson Aff. ¶ 9.

On May 15, 1993, Rico Monroe Jr. was born. Sadly, the child had numerous birth defects including, but not limited to, impairments of sight, hearing, ingestion, and intellect.[1] The child required intense medical care, both in and out of the hospital, throughout his entire life. On November 24, 1996, at an age of about 3 and a half years old, the child died.

A short history of Provera is in order before moving on. Provera is a synthetic analog of the naturally occurring female hormone progesterone. It is available only by prescription from a physician. The drug was first marketed in 1959 primarily for treatment of secondary amenorrhea, a condition marked by infrequent or suspended menstruation. Although there has been debate over Provera's teratogenicity,[2] in 1989 the FDA advised the manufacturer of Provera that it should delete warnings regarding the risks of pre-natal exposure to the drug. P & U wished to

---

1. Specifically, the child was diagnosed with microcephalia, blindness, hearing impairedness, abnormal smallness, mental and physical developmental delays, severe muscular/skeletal anomalies, undescended testes, ambiguous genitalia, malformed cardio/pulmonary blood vessels, esophageal atresia, palate deformities, inability to ingest by mouth, simian creases, and "numerous other defects and malfunctions." See plaintiff's complaint at 3.

2. A substance is teratogenic if it causes "developmental malformations." Webster's Ninth New Collegiate Dictionary 1216 (1990). Teratology is commonly understood as the study of the causes and prevention of human birth defects. See Brief for Plaintiff at 26.

continue to include such warnings, and, pursuant to the mandates of 23 C.F.R. § 601.12, asked permission of the FDA to do this. The FDA refused the variance from its warning guidelines. P & U sought permission to depart from the guidelines again in 1992. Again, the FDA refused the request. Since 1992, P & U has been marketing Provera in accordance with the guidelines imposed by the FDA.

## PROCEDURAL HISTORY

Basing her claims on the District of Columbia Wrongful Death statute, 16 D.C.Code § 2701, and Wrongful Survival statute, 12 D.C.Code § 101, the plaintiff brought suit on July 23, 1997 against the defendant on her own and her son's behalf. In her complaint, she alleged three counts. In her first count, products liability, the plaintiff alleged that the defendant's product was defectively designed and that it did not contain adequate warnings. In her second and the third counts, the plaintiff alleged breach of warranty and fraud respectively. On January 21, 2000, after a long period of discovery, defendant filed the motions now before this Court.

## ANALYSIS

As a preliminary matter, the Court notes jurisdiction under 28 U.S.C. § 1332 (1994). All defendants are citizens of states other than the District of Columbia, where Ms. Dyson is a citizen. The amount in controversy exceeds $75,000 exclusive of interest and costs. In matters requiring the application of substantive law, the law of the District of Columbia will govern. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### I. Standard for Summary Judgment Determination

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To survive a motion for summary judgment, the nonmovant must make a "sufficient showing to establish the existence of an element essential to that party's case." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. A "sufficient showing" exists when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### II. Defendant's Motion for Summary Judgment on the Products Liability Count

In making her products liability claim, plaintiff alleges that Provera had a design defect in that it was "unreasonably dangerous to women in early pregnancy." Compl. for Plaintiff at 5. Plaintiff further alleges that P & U failed to include an "adequate warning" of the drug's potential side-effects. *Id.* On both the design defect and failure to warn count, this Court finds that the plaintiff has not adduced sufficient evidence to survive a summary judgment motion. Accordingly, the Court grants the defendant's motion for summary judgment.

### A. Motion for Summary Judgment on the Design Defect Count

It is well established that to recover under a products liability theory, a plaintiff must show, inter alia, that the product in question was defective, and that the defect caused the alleged harm. *See, e.g., Word v. Potomac Elec. Power Co.,* 742 A.2d 452, 459 (D.C.1999). Since the adoption of section 402A, the products liability section of the Restatement (Second) of Torts, the chief dispute has been over what renders a product "defective." Prescription drugs, however, have partially escaped this melee over defectiveness. The escape route is known simply as "Comment k."

■ "Comment k" refers to the American Law Institute's special consideration of prescription drugs under section 402A. Prescription drugs garnered special attention from the Institute because drugs, unlike most other products, sometimes cause a great deal of pain that is nonetheless offset by a larger amount of health benefit. Comment k describes the phenomenon in detail:

> Unavoidably Unsafe Products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous.

Restatement (Second) of Torts, § 402A, Comment k. The District of Columbia has adopted section 402A. *See Berman v. Watergate West, Inc.*, 391 A.2d 1351 (D.C. 1978); *Cottom v. McGuire Funeral Service, Inc.*, 262 A.2d 807 (D.C.1970). *See also Raynor v. Richardson–Merrell, Inc.*, 643 F.Supp. 238, 247 (D.D.C.1986).

Comment k's association with strict liability may be misleading. As one court has noted, "[m]ost jurisdictions ... rely on Comment k as authority for applying what is effectively a negligence standard...." *Shirkey v. Eli Lilly & Co.*, 852 F.2d 227, 232 (7th Cir.1988) (collecting cases interpreting Comment k in negligence terms). *See also Raynor*, 643 F.Supp. at 247 (" 'Comment k simply adopts the ordinary negligence concept of duty to warn.' ") (quoting *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 426 (2d Cir.1969)). Thus understood, the issues here become those of any negligence case: duty, breach, causation, and injury. A drug manufacturer's duty comes from Comment k itself; the duty is to "properly prepare[ ]" the drug and include "proper directions and warning[s]" with it. The other elements, however, must come from the plaintiff, who, in this case, has faltered on the breach and causation elements. The plaintiff has adduced no evidence that the defendant breached its duty to properly prepare Provera. Regarding the defendant's duty to warn, the plaintiff has failed to present evidence that an inadequate warning, if any, caused the injuries in question.

1. Evidence of improper preparations

"Proper" in the Comment k context is undeniably a term of art. But that does not mean that its meaning is indeterminate. For example, according to several courts, "proper preparations" consist of taking "available and reasonable steps to lessen or eliminate the danger of even a significantly useful ... product." *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 655 (1st Cir.1981). *See also Graham by Graham v. Wyeth Labs., Div. of Am. Home Prods. Corp.*, 906 F.2d 1399 (10th Cir.1990); *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410 (Colo.1986). Other courts have held that when a pharmaceutical company ignores the FDA regulations during the drug development process, it has failed its proper preparation duty. *See Stanton by Brooks v. Astra Pharmaceutical Prods., Inc.*, 718 F.2d 553 (3d Cir.1983) (finding a manufacturer not protected by Comment k for failing to submit adverse reaction reports to the FDA).

■ The meaning of "properly prepared" need not be belabored, as the plaintiff has offered no evidence that even pertains to the defendant's manufacturing process. Her experts argue that Provera is a drug capable of causing birth defects, but they do not assert that P & U was capable of synthesizing a safer yet similarly effective form of the drug. Although

she claims forcefully in her pleading and briefs that P & U withheld information from the FDA during the labeling process, she fails to offer any evidence of this. Without such evidence, a reasonable jury could not find a breach of P & U's duty of proper preparation.

### 2. Evidence of Causation

 In the present case, the chief dispute is over the adequacy of the warning provided to Dr. Winfield by the defendant.[3] The plaintiff argues that, had the warning been more explicit and complete as to the risks of Provera, Dr. Winfield would not have prescribed the drug. However, the plaintiff fails to produce any evidence of this.

Whether defective or not, there is no evidence that the warning label read by Dr. Winfield caused him to alter his prescription in any way. Dr. Winfield testified that, had he known that the plaintiff was pregnant, he would not have prescribed Provera to her. Winfield Aff. at ¶ 5. He also testified that, had the packaging contained an extra warning as to prenatal risks, he still would have prescribed it for the plaintiff. Winfield Aff. at ¶ 10. These two statements, taken together, reveal that any change in the warning would have had no effect on whether Provera was prescribed to the plaintiff. In Dr. Winfield's uncontradicted opinion, the appropriateness of the drug turned on whether the plaintiff was pregnant, not on the warnings provided.

The plaintiff asserts that the Court should rely on *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712 (D.C.1985). *Payne* involved an injured consumer who was suing a manufacturer-defendant based on inadequate warnings. Find that proving

causation in such a case would be an "impossible burden," the court fashioned a rule providing that, where evidence suggests an inadequate warning, a rebuttable presumption arises that the inadequacy was the cause of the injury. *Id.* at 725. Although seemingly on point with the instant case, *Payne* is inapplicable in light of *Mampe v. Ayerst Laboratories*, 548 A.2d 798 (D.C.1988), decided several years after *Payne*.

*Mampe* involved a failure to warn claim, but the alleged inadequate warning was provided to a prescribing physician, not the ultimate consumer. In finding that the "presumption [of *Payne* did] not determine the outcome of [the] case," the court found a failure of causation in the unrebutted testimony of the prescribing physician. Id. at 802. The physician testified that the warning, no matter how altered, would have been irrelevant to his decision to prescribe the medication. Id. Finding that "the chain of causation was broken," the court held for the defendant. Id. at 803.

The chain of causation is also severed in this case. Like the plaintiff in *Mampe*, the plaintiff here has failed to rebut the testimony of Dr. Winfield with even a scintilla of evidence suggesting that a different warning would have changed his behavior.

### B. Motion for Summary Judgment on the Inadequate Warning Count

 An allegation of inadequate warnings, on top of the alleged Comment k breach of the duty to warn, is not as redundant as it might seem. Several courts have imposed liability for a defective warning notwithstanding a manufacturer's compliance with Comment k.[4] The District of Columbia, however, is not one

---

**3.** Almost as an aside, the plaintiff also asserts that the warning intended for the patient (the "package insert") was inadequate and caused her to take the drug. However, by plaintiff's uncontradicted testimony, she did not read the warning. Deposition of Lakeshia Dyson at 56. Absent a claim that the warning was too obscure to be noticed, an unread warning

cannot serve as a basis for a claim that the warning affected one's behavior.

**4.** *See, e.g., Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 780 (R.I.1988), *Toner v. Lederle Labs.*, 112 Idaho 328, 732 P.2d 297, 305 (Id.1987), *Feldman v. Lederle Labs.*, 97 N.J. 429, 479 A.2d 374, 383–84 (1984).

of those jurisdictions. As the District's high court recently stated "[A] strict liability action for failure to warn is 'really nothing more than a ground of negligence liability....'" *McNeil Pharmaceutical v. Hawkins,* 686 A.2d 567, 578 (D.C.1996) (quoting *East Penn Mfg. Co. v. Pineda,* 578 A.2d 1113, 1118 n. 5 (D.C.1990)).

In the final analysis, however, it makes little difference whether the issue is considered under a negligence or strict liability regime. That is because both causes of action require proof of causation. In the instant case, as discussed above, the plaintiff has offered no evidence that the warning, inadequate or otherwise, was the proximate cause of the injuries to her son. Thus, the plaintiff's claim of strict liability for failure to warn cannot proceed.

### III. Defendant's Motion for Summary Judgment on the Breach of Warranty Count

■ This motion can be handled quickly as the plaintiff has correctly conceded that a breach of warranty claim is not actionable in coordination with a products liability claim. As this Court has explained before, "the difference between strict liability in tort and implied warranty, if any, are conceptual." *Wainwright v. Washington Metro. Area Transit Auth.,* 903 F.Supp. 133, 139 (D.D.C.1995) (quoting *Cottom v. McGuire Funeral Serv., Inc.,* 262 A.2d 807, 808 (D.C.1970)). Accordingly, "where there are no issues unique to [the] warranty [claim]," the warranty claim effectively merges with the strict liability claim. *Id.*

### IV. Defendant's Motion for Summary Judgment on the Fraud Count

A. Plaintiff's Rule 56(f) Motion

■ As a preliminary matter, the plaintiff requests the Court, pursuant to Rule 56(f), use its inherent discretion to forestall the defendant's summary judgment motion until further discovery can be had. The plaintiff claims that several categories of files are necessary to mount a sufficient defense to the defendant's motion.[5]

Rule 56(f) recognizes the essentiality of discovery in defending a summary judgment motion.[6] It "allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the non-moving party has not had an opportunity to make full discovery." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The thrust of the provision is to prevent a party from being "railroaded" by "premature motions." *Id.* The provision is not intended, however, as a way for the nonmovant to stave off summary judgment by returning to the wishing well of discovery. Thus, extending discovery under 56(f) is inappropriate when a party has had ample time for discovery or when it has failed to immediately bring the discovery problem to the court. *See Crawford v. Signet Bank,* 179 F.3d 926 (D.C.Cir.1999); *Willoughby v. Potomac Elec. Power Co.,* 100 F.3d 999, 1003 (D.C.Cir.1996).

■ In the case at hand, the Court declines to order a continuation of discovery. This case began in July 1997. The defendant filed its motions for summary judgment in January of 2000. While

---

**5.** Specifically, the plaintiff seeks (1) certain "product files" referred to various depositions, (2) documents "pertaining to the teratogenicity" of Provera/Depo–Provera considered by a product steering committee, (3) the "Thailand study" and related documents, and (4) advertising and marketing materials for Provera/Depo–Provera. Brief for plaintiff at 13.

**6.** Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just. Fed.R.Civ.Pro. 56(f).

claims involving large corporations often involve extensive discovery, two years is sufficient time to find the small quantum of evidence needed to survive a summary judgment motion. The plaintiff suggests that evidence would have been found but for the defendant's "obfuscation." The proper way to deal with such behavior is a motion to compel. True, the plaintiff filed such a motion on June 27, 2000. But the summary judgment motion under consideration was filed January 21, 2000. A party cannot escape summary judgment through such delay. Thus, the plaintiff's Rule 56(f) motion is denied, and the Court will now consider the defendant's motion for summary judgment on the fraud count.

### B. Defendant's Motion for Summary Judgment

Plaintiff alleges that she was defrauded by labeling on the Provera packaging. The defendant disagrees and motions for summary judgment. This Court agrees with the defendant, and accordingly grants summary judgment on the fraud count.

The facts of this case implicate two types of fraud, traditional fraud, which, for clarity's sake, will be referred to here as "direct fraud," and third-party fraud. In this case, a claim of direct fraud arises if the defendant deceived the plaintiff through the package insert included with the medicine. A third-party fraud claim arises if the defendant deceived the FDA during the agency's determination of the correct warnings for Provera. Each type of fraud will now be considered in turn.

### 1. Direct fraud

■■■■ In the District of Columbia, "one commits fraud by making (1) a false representation, (2) in reference to a material fact, (3) ... with knowledge of the

falsity, (4) ... intent to deceive, and (5) action is taken in reliance upon the representation." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977). The fifth requirement alone is enough to dispose of the plaintiff's direct fraud claim. The "action taken in reliance" requirement is analogous to the causation element in tort. And, as detailed above, the plaintiff has proffered no evidence that the package insert affected her behavior. *See* note 3. Thus, like the plaintiff's tort claim, the fraud claim must fail.

### 2. Third-party fraud

■■■■ The defendant's actions can also give rise to a third-party fraud claim. Such a claim involves a misrepresentation made to one person with the expectation that "its terms will be repeated to [another], and that it will influence [that other's] conduct." Restatement (Second) of Torts § 533.[7]

■■■■ Often called "fraud-on-the-FDA" claims, third-party fraud claims in the drug regulatory context generally allege that a defendant has caused an insufficient warning by withholding information from the FDA. *See Jones v. Sofamor, S.N.C.*, 1999 WL 1062103 at *8 (N.D.Ga. 1999) (explaining the pedigree and rationale behind a fraud on the FDA claim). The plaintiff in the instant case makes just this assertion. She points to several studies in the defendant's possession that detail Provera's risk of birth defects. However, she proffers no evidence that the defendant withheld this information. Thus, because no reasonable jury could find the defendant to have withheld information from the FDA, the defendant's motion for summary judgment is granted.

---

7. Section 553 reads in full:
The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not directly made to the other, is made to a third person and the maker intends or has

reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.
Restatement (Second) of Torts § 553.

## CONCLUSION

In sum, the Court fails to find sufficient evidence for the plaintiff to survive the defendant's motions for summary judgement. Accordingly, the plaintiff's claims of products liability, breach of warranty, and fraud cannot proceed.